1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| United States of America, | ) | |
|---|---|---|
|     Plaintiff, | ) | CR 10-01838-TUC-RCC (JCG) |
| | ) | |
| vs. | ) | **REPORT &** |
| | ) | **RECOMMENDATION** |
| 2) Maria Jesus Gallardo-Lomas, | ) | |
| | ) | |
|     Defendant. | ) | |
| | ) | |

       Pending before the Court is a Motion to Suppress Statements filed by Defendant Maria Gallardo-Loma on August 19, 2010. (Doc. No. 13.)  The United States filed a Response to the Motion on September 1, 2010.  (Doc. No. 16.)

       This matter came before the Court for a report and recommendation as a result of a referral made on July 23, 2010, pursuant to LRCrim 5.1. (Doc. No. 4.)  This matter was set for evidentiary hearing and evidence was heard on September 10, 2010.  Defendant, who remains in custody at this time, was present and represented by counsel.  This matter was submitted following oral argument at the conclusion of the hearing and taken under advisement.

       Having now considered the matter, the Magistrate Judge recommends that the District Court, after its independent review, deny Defendant's Motion to Suppress Statements.

1

**FACTUAL FINDINGS**

2

3   On July 20, 2010, at approximately 10:40 a.m., defendants Noel Soto-Verdugo and

4   Maria Gallardo-Lomas entered the United States from the Republic of Mexico at the

5   DeConcini Port of Entry in Nogales, Arizona.  Soto-Verdugo was the driver; Gallardo-Lomas

6   was the front seat passenger.  Customs and Border Protection ("CBP") Officer Douglas

7   Perez, who was working a vehicle lane that morning, noticed abnormalities in the vehicle,

8   searched the car and found packages that appeared to contain contraband.  The defendants

9   were arrested and taken to the station.  Defendant Gallardo was placed in a holding cell and

10  Immigration and Customs Enforcement ("ICE") Special Agent Quisenberry was notified of

the defendants' arrests.

11  Agent Quisenberry came to the Port of Entry to interview the defendants.  Agent

12  Quisenberry went to the holding cell where Gallardo was confined, sitting quietly, and

13  requested that she answer a few questions. Because Gallardo is a Spanish speaker, Officer

14  Perez was asked to assist in the interview by translating.  Agent Quisenberry, Officer Perez,

15  and two ICE agents detailed from New York, led Gallardo to the elevator and upstairs to a

16  vacant room to conduct the interview.  Gallardo, who was not handcuffed or shackled,

17  walked on her own accord.  The interview room contained a table and three chairs.  Gallardo

18  was seated in one chair.  Agent Quisenberry sat a few feet away in a chair facing Gallardo.

19  There was empty space between the two. Officer Lopez stood against a wall behind

20  Quisenberry.  CBP Officer Terri Woodhouse joined in the interview at some later unknown

21  time and also served as a translator.  The door to the room was open during the interview.

22  Prior to initiating any questions, Officer Perez read Gallardo her Miranda rights in

23  Spanish word for word from a waiver form written in Spanish.  Gallardo was provided with

24  a copy of the waiver.  Gallardo signed the waiver, averring that she had been read her

25  Miranda rights, understood those rights and was choosing to speak freely with law

26

27

28

enforcement officers.  Officer Lopez testified that Gallardo appeared to understand his Spanish and never gave any indication that she did not understand.

During the interview, Gallardo appeared to be in good health; she did not ask for food, water, or a break at anytime.  Officer Lopez and Agent Quisenberry both testified that Gallardo was calm and collected throughout the interview.  Her demeanor never changed. She showed no reaction - even when confronted with a statement that drugs were found in the vehicle. Her tone and volume were conversational or "normal" throughout the interview - regardless of whether Officer Lopez or Officer Woodhouse was translating.  Her voice never quivered.  She never cried.  Her eyes did not appear to be red and she did not appear to be upset. The interview lasted approximately 40 minutes. The interview was not recorded. When the interview was over, Gallardo was escorted back to the holding cell.

Gallardo testified that she is a 47-year old, single mother.  On July 20, 2010, at 6:20 a.m., she went to the factory where she has worked in Nogales, Sonora, for the last twenty years, and around 9:00 a.m., she requested time off to pick up a form to apply for government assistance. At some point, she received a call from co-defendant Soto, her niece's husband, requesting that she accompany him to Walmart in the United States. Gallardo explained that Walmart is much cheaper than stores in Mexico, so she decided to take advantage of the opportunity because she needed to buy catsup, mayonnaise and butter.

Contrary to the agents' testimony, Gallardo testified that after she was detained, she was shackled and handcuffed in a holding cell. Officers eventually returned, put her into a patrol car and drove her to a place that she didn't know the name of, "but they call it the 'Chicken House.'"[1]

---

[1] The reference to the Chicken House was never developed , explained or argued.  Nor was Gallardo's testimony that she was placed in a patrol car and driven to this  location for questioning. This testimony obviously conflicts with the officers' testimony that she was taken from the holding cell to the second floor of the same building via elevator.  As Gallardo appeared confused during this portion of her testimony, the issue was not pressed by either counsel, and Gallardo's later description of the interview process was fairly consistent with that of the officers, the Magistrate does not find credible Gallardo's testimony that she was driven to a place called the Chicken House for questioning.

Like the officers, Gallardo testified that she was not shackled or handcuffed during the interview. She acknowledged that Officer Lopez presented her with the written interview, but she said she told him she could not read the waiver without her glasses, and he then read the waiver form to her in Spanish.[2] Gallardo admitted that she was informed of her rights, knew that she could stop the interview at any time or seek the counsel of an attorney, and that she never asked any of the officers to cease the interview or for a break of any kind. On direct examination, Gallardo testified that she signed the waiver because she was nervous but, on cross-examination, she testified that she was calm during the time of the advisement of rights.

Gallardo also testified that she was calm until Officer Woodhouse began to ask questions in a "nasty, haughty" way. Gallardo said that Officer Woodhouse was yelling at her and Gallardo started shaking and could not talk. She testified that she cried, but she did not know if any of the agents noticed. Gallardo testified that Woodhouse said "just talk and tell the truth or you're just playing dumb - that's what she meant"; and that Woodhouse said to talk if Gallardo did not want to go to jail. When Woodhouse asked Gallardo if she knew what she had with her, Gallardo replied "no." Gallardo stated that she continued to answer questions because she was nervous. She acknowledged that she did not ask for the questioning to stop. At some point, she was so nervous she could not talk. According to Gallardo, that's when the agents stopped asking her questions.

Gallardo testified that she did not admit at any time during the interview that she was involved in bringing drugs over; however, her attorney stated in argument that Gallardo did in fact make incriminating statements at sometime during the interview[3] As noted above, it

---

[2]Although Gallardo initially testified that she cannot read without her glasses, she later testified that she could read, very well, the bigger letters on the waiver form, which had been placed in front of her on the witness stand.

[3]Gallardo's response to her attorney's question whether she made incriminating statements was permitted over the government's objection. No party sought to introduce evidence in contradiction of Gallardo's testimony that she never admitted involvement in the drugs. When asked for clarification during argument as to whether Gallardo was claiming that she never made

was not established when Officer Woodhouse took over translation duties from Officer Lopez or whether Gallardo made incriminating statements before and/or after Woodhouse began translating.

The Magistrate noted that when Gallardo testified she was soft-spoken. She testified in a monotone voice and, similar to what the agents described, appeared to have no emotional reaction to the questions asked. The only change in demeanor the Magistrate observed during Gallardo's testimony was that on one or two occasions, Gallardo took a deep breath.

## ANALYSIS

A defendant's constitutional rights are violated if his confession is obtained in violation of his *Miranda* rights or if coercive interrogation tactics render the confession involuntary. *See Dickerson v. United States*, 530 U.S. 428, 432 (2000).

a.   Waiver

*Miranda v. Arizona*, 384 U.S. 436 (1966), and its progeny govern the admissibility of statements made during custodial interrogation in both state and federal proceedings. Statements made while a defendant is in "custody or otherwise deprived of [his] freedom of action in any significant way" which are not preceded by *Miranda* warnings are inadmissible in evidence. *Id*. at 444.   For incriminating statements obtained during a custodial interrogation to be admissible, any waiver of *Miranda* rights must be voluntary, knowing, and intelligent. *See Miranda*, 384 U.S. at 479.  A waiver of *Miranda* rights "is knowing and intelligent if, under the totality of the circumstances, it is made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1127 (9th Cir. 2005) (citations and quotations omitted). In considering the totality of the circumstances, factors to consider include:  (1) the defendant's mental capacity; (2) whether the defendant signed a written waiver; (3) whether the defendant was advised in her native tongue or had a translator; (4)

---

incriminating statements, defense counsel stated that Gallardo was not disputing that she made such statements later in the interview.

whether the defendant appeared to understand her rights; (5) whether the defendant's rights were individually and repeatedly explained to her; and (6) whether the defendant had prior experience with the criminal justice system." *United States v. Crews*, 502 F.3d 1130, 1140 (9th Cir. 2007). To be knowing and intelligent, "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). There is a presumption against waiver, and the Government bears the burden of proving a valid waiver by a preponderance of the evidence. *See Colorado v. Connelly*, 479 U.S. 157, 168 (1986); *Crews*, 502 F.3d at 1140; *United States v. Bernard S.*, 795 F.2d 749, 751 (9th Cir. 1986).

The government has proved by a preponderance of the evidence that Gallardo waived her *Miranda* rights. Gallardo admitted that Officer Lopez read each right to her in her native language of Spanish, that she was provided with a written waiver also in Spanish, and that she signed a waiver of those rights. Gallardo admitted that she understood the rights. Officer Lopez testified that Gallardo appeared to understand him and Gallardo acknowledged that she was calm when she was informed of the rights and signed the waiver. There is nothing to suggest a hostile environment or any type of coercion which would negate Gallardo's waiver. Given the totality of the circumstances, a valid waiver occurred.

       b.    Voluntariness

Even when the procedural safeguards of *Miranda* have been satisfied, a defendant is deprived of due process if his conviction is founded upon an involuntary confession. *See Dickerson*, 530 U.S. at 432. To ensure due process, the test for determining the voluntariness of a suspect's confession is whether, considering all the circumstances, the government obtained the statement by physical or psychological coercion or by inducement so that the suspect's will was overcome. *See United States v. Coutchavlis*, 260 F.3d 1149, 1158 (9th Cir. 2001) (citing *Haynes v. Washington*, 373 U.S. 503, 513-14 (1963)). The circumstances to be considered include: (1) whether there was police coercion; (2) the length of the interrogation, its location and its continuity; (3) whether police advised the suspect of her

rights; and (4) whether there were any direct or implied promises of a benefit. *Clark v. Murphy*, 331 F.3d 1062, 1072 (9th Cir. 2003). "A statement is involuntary if it is extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence." *Id.* (quoting *Hutto v. Ross*, 429 U .S. 28, 30 (1976)). Courts also consider the defendant's age, education, the nature of any questioning, and the use of any physical punishment such as the deprivation of food or sleep to determine voluntariness. *See United States v. Haswood*, 350 F.3d 1024, 1027 (9th Cir. 2003) (*citing Schenckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)).

The standard of review does not change when the inquiry shifts from the voluntariness of an asserted *Miranda* waiver to the voluntariness of the confession under general Fifth Amendment principles. *See Collazo v. Estelle*, 940 F.2d 411, 415 (9th Cir. 1991). "In short the true test of admissibility is that the confession is made freely, voluntarily, and without compulsion or inducement of any sort." *Haynes v. State of Washington*, 373 U.S. 503, 513-14 (1963). An officer who attempts to pressure a defendant into changing his mind about remaining silent, and into talking without counsel to his interrogators, violates that defendant's Fifth Amendment rights. *See Collazo v. Estelle*, 940 F.2d 411, 419-20 (9th Cir. 1991).

Under the totality of the circumstances, Gallardo's confession was voluntary. There is no evidence of police coercion or direct or implied promises. The interview was short (approximately 40 minutes), was conducted in a large room with an open door, and occurred within an hour of her arrest. Gallardo is 47 years old and appears to be of average intelligence. Gallardo was not handcuffed or shackled. She did not indicate that she was uncomfortable, hungry, tired or impaired in any manner. She appeared calm during the interview, even when the agents confronted her with the information that drugs had been discovered in the car. She never asked for a break. Although Gallardo testified that she started to cry at one point in the interview, she was not sure that any of the other agents noticed. Given the agents' proximity to Gallardo and the Magistrate's observation of

Gallardo's demeanor and quietness during her court testimony, the Magistrate concludes that Gallardo means that her crying was soft and not readily apparent. Finally, Gallardo admitted that she understood her *Miranda* rights, yet she never attempted to assert any of her rights, including her right to terminate questioning.

Gallardo's sole basis for asserting that her confession was involuntary is her claim that she was intimidated by Officer Woodhouse who, at some point during the questioning, served as a translator and who spoke to Gallardo in a nasty tone and an aggressive manner and told her she was going to jail. "Numerous cases have held that questioning tactics such as a raised voice, deception, or a sympathetic attitude on the part of the interrogator will not render a confession involuntary unless the overall impact of the interrogation caused the defendant's will to be overborne." *See United States v. Astello*, 241 F.3d 965, 966 (8th Cir. 2001) (internal citations omitted.)   Even accepting Gallardo's accusation regarding Woodhouse's tone and manner as true,  the alleged conduct does not rise to the level of police influence found to be coercive.  Nothing in Gallardo's testimony evidences that Woodhouse used trickery or deceit or even that she used harsh language.  Woodhouse's alleged statement that "Gallardo was going to jail" does not amount to an impermissible threat where it would be true that involvement in importing drugs would lead to criminal charges, as in fact, happened when Gallardo was charged with the current offenses.  *See United States. v. Sanchez,* 2010 WL 3119891, *8 (8th Cir. 2010) (overruling district court's determination that juvenile's confession was involuntary where officers told juvenile told he was going to jail, planted idea of possible retaliation by the victim's brother, and showed juvenile a graphic photograph of the victim's injuries).  There is no evidence that Gallardo  gave incriminating statements as a result of Woodhouse's techniques.  In fact, according to the agents, Gallardo's demeanor never changed in response to any question asked by Woodhouse.

In considering the merits of a claim of coercion, the court must also consider the effect that the totality of the circumstances had upon the will of the petitioner. *See Schneckloth*, 412 U.S. at 226.  Here, Gallardo did not contend that she felt pressured to talk.  Rather, she

claimed that she became so shocked that she could not speak while being questioned by Officer Woodhouse; she also testified that she never admitted involvement.  *See United States v. Lemusu*, 135 Fed.Appx. 52 (9th Cir. 2005) (defendant's will not overborne where defendant seated in conference room for four hours, police asked only booking questions and defendant never felt pressured to talk); *Johnson v. Prosper, 2009 WL 2761333, *14 (N.D.Cal. August 31, 2009)* (defendant's testimony that he did not admit any involvement in crime after use of certain interrogation techniques suggests that the tactic did not deprive defendant of his capacity to make a free and unconstrained choice in deciding to confess). Although defendant's counsel stated that Gallardo later made incriminating statements, there was no evidence presented that these statements were made in response to any coercive tactic by one of the interrogators.

"Cases in which a defendant can make a colorable argument that a self-incriminating statement was compelled despite the fact that law enforcement authorities adhered to the dictates of *Miranda* are rare."  *Berkemer v. McCary,* 468 U.S. 420, 433 (1984); *see United States v. Sanchez,* 2010 Wl 3119891, *6 (8th Cir. 2010) (quoting *United States v. Astello*, 241 F.3d 965, 966 (8th Cir. 2001)). This case is no exception.  Gallardo was given her rights and admitted that she understood them.  There is no evidence that the government obtained Gallardo's subsequent statement by physical or psychological coercion or by inducement so that Gallardo's will was overcome. Under the totality of the circumstances, Gallardo's statements were voluntary.

## RECOMMENDATION

In view of the foregoing, it is recommended that, after its independent review of the record, the District Court DENY Defendant's Motion to Suppress Statements (Doc. No. 13.)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

The parties have **fourteen (14) days** to serve and file written objections to the Report and Recommendation.  The parties are advised that any objections should be filed with the following caption:  **CR 10-1838-TUC-RCC.**

DATED this 15th day of September, 2010.

_____
Jennifer C. Guerin
United States Magistrate Judge